# EXHIBIT 1

```
 1                    D R A F T

 2            (Federal Court Reporter Lee A. Marzilli)

 3    July 21, 2025, motion hearing in person before Judge Saris.

 4    Braunstein, et al v. X Corporation, et al.

 5            Start, 2:40 p.m.

 6            THE CLERK:  Court calls Civil Action 25-20733,

 7    Braunstein et al v. X corporation et al.  Could counsel please

 8    identify themselves.

 9            MS. LISS-RIORDAN:  Good afternoon, your Honor.  For

10    petitioners, I'm Shannon Liss-Riordan.  With me is Jack

11    Bartholet.

12            MR. NELSON:  Good afternoon, your Honor.  For

13    respondents, my name is James Nelson.

14            MS. ENGELMAN:  And I'm Keri Engelman.

15            THE COURT:  Okay, please be seated.  I find it a

16    little bit ironic that X is resisting the arbitration, since

17    just last week I issued an opinion allowing a motion to compel

18    that Mr. Musk filed involving Teslas insisting on arbitration.

19    So it's sort of like a flip in the position kind of thing.  I

20    don't know, were you involved in that other lawsuit?

21            MR. NELSON:  I was not, your Honor.  No, no, your

22    Honor.

23            THE COURT:  They pressed very hard for arbitration in

24    the Tesla cases, so it's sort of ironic that you're now on the

25    other side of this.
```

1          Am I understanding correctly, you want to go to court

2     in every single one of these cases?

3          MR. NELSON:  So, no, your Honor.  Our position is

4     simply that both sides have to share the fees until the

5     arbitrations get to an arbitrator.

6          THE COURT:  How could somebody afford it?

7          MR. NELSON:  Well, your Honor, I have the record of

8     the Zhang arbitration which is attached to their reply.  It's

9     actually only $2,000 to get to the arbitrator to make this full

10    decision, and they've never put forward any evidence that they

11    could not afford it.

12         THE COURT:  It's just -- anyway, it's ironic, let's

13    just put it that way, since there was such an insistence on the

14    importance of arbitration.

15         So why don't you go on the motion to compel

16    arbitration.

17         MS. LISS-RIORDAN:  Sure, your Honor.  I think you hit

18    it right on the head.  X Corp. in fact has demanded arbitration.

19    Every time we filed a case in court, they moved to compel

20    arbitration, so we began filing these cases in arbitration.

21    Once we had filed more than 2,000 cases in arbitration, they've

22    started regretting their strategy.  And although they were

23    initially paying all of the fees, both JAMS and Triple A

24    ordered that X pay all of the fees other than the initial

25    filing fee that the claimants paid.  Then they came up with

1   this bright idea that they were going to refuse to do that

2   outside California, Nevada, and Oregon on the grounds that they

3   don't think that it's required that they pay all the other fees

4   in the other states.  But they neglect to recognize that it was

5   Twitter's arbitration clause that required arbitration.  It

6   required for most of the employees arbitration before JAMS,

7   pursuant to the JAMS rules.

8         THE COURT:  So it started off with JAMS, and most of

9   the cases are JAMS cases in the case law.

10        MS. LISS-RIORDAN:  Right.  And the same thing happened

11   with Triple A because we then agreed to use Triple A for the

12   employees who didn't have JAMS in their agreements.  An earlier

13   version of the agreement didn't specify JAMS, so we reached an

14   agreement that Triple A would be used, but the exact same thing

15   happened with Triple A.  Both JAMS and Triple A determined that

16   Twitter had to pay all of the fees, and they were paying them.

17   They were even paying them in Massachusetts.

18        THE COURT:  Can you distinguish for me.  There were

19   two buckets of fees.  The first is the initial ones.

20        MS. LISS-RIORDAN:  Yes.

21        THE COURT:  And they say plaintiff has to pay the

22   initial ones?

23        MS. LISS-RIORDAN:  Right.  We paid all of those.  We

24   paid all of the initial filing fees.

25        THE COURT:  And that's not in dispute?

1          MS. LISS-RIORDAN:  That's not in dispute.

2          THE COURT:  How much is that?

3          MS. LISS-RIORDAN:  I believe it varies between -- so

4     it's about $400.  It's the same as or less --

5          THE COURT:  -- by themselves to start it?

6          MS. LISS-RIORDAN:  Yes, correct.

7          THE COURT:  And then the fee structures of both of

8     those institutions kick in?

9          MS. LISS-RIORDAN:  Correct, yes.

10         THE COURT:  And they've construed it as being what?

11    It's presumptively the employer unless the arbitrator decides

12    otherwise?

13         MS. LISS-RIORDAN:  Yes.  So both JAMS and Triple A

14    applied their own rules, and Twitter agreed to abide by the

15    rules of JAMS and Triple A because they agreed to and even

16    required JAMS to be the arbitration provider, and then we

17    agreed to Triple A.  So they agreed to submit to those rules.

18    Both JAMS and Triple A both applied their own rules and said

19    that Twitter had to pay all the fees beyond the initial filing

20    fee.  That is an issue that is expressly delegated to

21    arbitration in the arbitration agreement.

22         THE COURT:  Unless the arbitrator decides otherwise,

23    right?

24         MS. LISS-RIORDAN:  Well, I mean, that's not completely

25    clear, to be honest.  The case law says that JAMS and Triple A

1   as entities can interpret and apply their own rules.  But the

2   point is that Twitter never even let us get to individual

3   arbitrators because they just refused to pay any more fees and

4   go forward.

5          THE COURT:  How much are the fees typically?

6          MS. LISS-RIORDAN:  It varies by arbitrator.  We have

7   done 174 of these arbitrations to date.  The fees range

8   anywhere from $50,000 to $100,000 to $200,000 or more per case.

9          THE COURT:  And how much are they typically looking

10  for in terms of back wages or -- I don't even know what they're

11  looking for.

12         MS. LISS-RIORDAN:  It's mostly a severance agreement,

13  that they were promised they would be paid severance in the

14  event they were laid off.  Elon Musk laid off 80 percent of the

15  work force when he bought the company, and then reneged on the

16  promise of severance that the employees would receive.

17         THE COURT:  And how much would those amount to?

18         MS. LISS-RIORDAN:  It ranges anywhere from $100,000 to

19  a couple million dollars or more.

20         THE COURT:  So big money.

21         MS. LISS-RIORDAN:  For many people, yes, right.  But

22  the point of it is, is that Twitter is playing games here

23  because they moved to compel arbitration.  We said, okay, fine,

24  we'll file an arbitration.  We filed these arbitrations, and

25  then, like I said, we started going down the road.  We've been,

1    for the last more than a year, we've been arbitrating these

2    cases and have arbitrated 174 cases to date.  Twitter has

3    properly paid its fees.  But then when it saw the writing on

4    the wall about how expensive this was getting, they stopped --

5    they announced -- it was actually back in June 2023 they

6    announced they were no longer going to pay fees outside of

7    California, Oregon, and Nevada.  But they had already paid

8    fees.  In fact, we've already had at least one case in

9    Massachusetts, and they paid the fees for that.  But then they

10   decided they didn't want to pay any more, and they started

11   playing games, and they said that it should be evenly split,

12   even though JAMS and Triple A ruled, "No, you have to pay it."

13   So we moved to compel arbitration, and we did it in a case in

14   the Northern District of California, a case we refer to as *Ma*

15   *v. Twitter*.

16        THE COURT:  I read that.  Judge Tigar?

17        MS. LISS-RIORDAN:  Yes.  Judge Tigar agreed with us

18   that Twitter had to pay all the fees, but then he declined our

19   request to compel arbitrations because he said the arbitrations

20   are supposed to take place all over the country; you have to go

21   and get orders from judges all over the country.  So that's why

22   we're here for the Massachusetts petitioners.

23        THE COURT:  Judge Rakoff came off the same way

24   effectively.

25        MS. LISS-RIORDAN:  He did, in *Frazier v. Twitter,*

1    correct.  And we filed cases around the country, and, frankly,

2    we shouldn't have to do this.  It's Twitter who wanted

3    arbitration, and they just don't want to lie in the bed that

4    they made.

5            THE COURT:  How many cases are now in Massachusetts.

6            MS. LISS-RIORDAN:  There are these cases.  I don't

7    know the exact count of how many are petitioners here.  It's

8    some dozen.  We actually have another case --

9            THE COURT:  Otherwise you can just be Massachusetts.

10   Is that the basic --

11           MS. LISS-RIORDAN:  I'm sorry?

12           THE COURT:  You're looking for relief just for

13   Massachusetts?

14           MS. LISS-RIORDAN:  From you.  We also filed cases in

15   New York and Colorado and Washington and Illinois.  We don't

16   think we should be having to file these cases all over the

17   place, but we are because that's what Judge Tigar said.

18           Just so you know, we have another case that's also

19   been assigned to your Honor for a handful of employees who

20   don't have their actual signed arbitration agreements, and so

21   Twitter wouldn't go forward with their arbitrations, so we just

22   filed these cases before you.

23           THE COURT:  Can I say, that was one of the lead-off

24   arguments about this case.  Do you have proof that all the

25   people who you have suing have actually got agreements?

```
 1            MS. LISS-RIORDAN:  Yes, yes.  They're attached to our
 2   reply.  We have many --
 3            THE COURT:  I saw them, but they're al of them?  It
 4   covers all of them?
 5            MS. LISS-RIORDAN:  Yes.
 6            THE COURT:  Is that issue moot at this point?
 7            MR. NELSON:  Yes, your Honor.  We're not disputing --
 8            THE COURT:  Don't you have a list of everyone who did?
 9            MS. LISS-RIORDAN:  Yes, they do.
10            MR. NELSON:  Your Honor, it's the burden of petitioners
11   to always put forward --
12            THE COURT:  Oh, come on.  I have limited time.  I
13   mean, I don't want to have a fight about something that you --
14   you have a checklist that they have it.  It was your lead
15   argument.
16            MR. NELSON:  Your Honor, we were just pointing out
17   that they put forward no evidence in their motion, which was
18   true as they conceded --
19            THE COURT:  Well, if you had a basis for disputing it,
20   it would be one thing, but you don't.  So, anyway, let's get to
21   the merits of it.
22            MS. LISS-RIORDAN:  Right.  So, anyway, there are a lot
23   of games that are played in the briefing.  I don't know if
24   there's anything in particular you want me to address, but it's
25   just very simple.  Arbitration --
```

1          THE COURT:  How do you deal with the word the

2    arbitrator shall "apportion"?  I don't know that it means

3    50/50.  I don't know that "apportion" necessarily means that,

4    but it does seem to give the individual arbitrator some power

5    here.

6          MS. LISS-RIORDAN:  Well, there's plenty of case law

7    and it's in our briefing about the arbitrator can mean JAMS and

8    Triple A.  But the point is that we haven't even been able to

9    get to the arbitrators because they won't follow the orders of

10   JAMS and Triple A to pay those fees.  And in fact we have cases

11   in which we actually have individual arbitrators appointed, and

12   I asked the arbitrator to go ahead and rule that they have to

13   pay the whole fee.  And I had one arbitrator who is a retired

14   justice from the Supreme Court of Washington say, "Oh, they

15   absolutely have to pay.  I'm going to put that in a written

16   order."  And then they protested because this was pending in

17   court, and so JAMS stopped the arbitrator from acting because

18   the issue was on appeal in court.

19         THE COURT:  But the one way I was thinking, to the

20   extent there's an ambiguity, doesn't the arbitrator decide what

21   apportion means?

22         MS. LISS-RIORDAN:  Yes, yes, absolutely.

23         THE COURT:  The individual arbitrator.

24         MS. LISS-RIORDAN:  It's delegated, right.  And we've

25   also said all along we're fine with that too, but they won't

 1  even let these cases go forward so we can take it up with

 2  arbitrators.

 3          THE COURT:  All right, well, let me hear from you all

 4  because it does seem, when you sign up for JAMS or Triple A,

 5  aren't you buying into their rules?  So, anyway, thank you.

 6          MS. LISS-RIORDAN:  And, also, just the last thing I'm

 7  going to say, arbitration is supposed to move quickly, and

 8  they've tied up these cases for two years now over this, so we

 9  would ask that the Court order arbitration quickly so we can

10  get on with these cases.  Thank you.

11          MR. NELSON:  Your Honor, JAMS rules, to answer your

12  question, are incorporated into the agreement, and JAMS

13  Rule 31(a) says that the default in every employment case, the

14  default is 50/50 pro rata share of fees, and they've never

15  disputed that in their motion or their reply.  That's

16  Rule 31(a).  For employment cases, 50/50 default for splitting

17  of fees, and that is what is incorporated into the agreement.

18          THE COURT:  Rule 31(a) of --

19          MR. NELSON:  Of the JAMS employment rules, your Honor.

20  And for an employment case like this, the default is pro rata

21  share.  31(c) right after that is the only exception in the

22  JAMS rules, and that is if the arbitration agreement is

23  required as a condition of employment.  And we cited at least

24  half a dozen cases from all over the country holding that where

25  there's an opt-out from an arbitration agreement, or it's

1  optional whether you have to go forward with it, it is not

2  required as a condition of employment.

3        THE COURT:  What Judge Rakoff did, and I think

4  Judge Tigar said was, well, you have to sign onto it, but then

5  you can later opt out, so it's a rule that (?) non-ambiguous.

6        MR. NELSON:  So that was Judge Rakoff's reasoning,

7  yes, your Honor, but we do not agree with that as a factual

8  matter or a legal matter.  Factually --

9        THE COURT:  Don't you have to say -- when you sign on,

10  you have to agree to it, and then you have the right to opt out

11  within 30 days, right?

12        MR. NELSON:  So they have to sign it, but they can opt

13  out simultaneously or even before they sign it.  The opt-out

14  actually says, "Within 30 days of receiving this package, you

15  can opt out."  And there are many cases, including in the SDNY,

16  the same court as Judge Rakoff, saying that even if you have to

17  sign it -- this is the *Marino* case that we cited, your Honor --

18  you at least have to sign it.  If you're able to opt out, then

19  it is not required as a condition of employment.

20        We also cited the *Young* case from the Northern

21  District of California and the *Mohamed* case from the Ninth

22  Circuit, all holding exactly the same thing.

23        THE COURT:  On this contract?

24        MR. NELSON:  Not on this contract, your Honor, but

25  it's holding that if there's an arbitration agreement that you

 1    have to sign but you can opt out, that it is not required as a

 2    condition of employment, so rejecting exactly their argument

 3    here.  Judge Rakoff in *Frazier* is the only case that we can

 4    find anywhere in the country and it's the only case that they

 5    cited holding that that is still a required agreement, even

 6    though you're able to opt out.

 7         I'd like to use an analogy, if I may.  I think if I

 8    send my oldest son to a school, and the school automatically

 9    opts you into field trips every semester, but then after you

10    enroll, you're allowed to sign a paper saying, "I want to opt

11    out of field trips, I don't want my son going to those field

12    trips," if somebody asked me, are field trips required for you

13    to go to that school, the answer would clearly be "no," they're

14    not required.  Even though I had to enroll and then later opt

15    out, field trips are not required.

16         It's the same thing here.  Arbitration is not required

17    for any employee of Twitter or X.  And actually they cited on

18    Page 5 of their motion an example where Twitter did not move to

19    compel arbitration because the employee had opted out, and they

20    were not subject to the DRA.  And, actually, I would direct

21    your Honor to Section 8 of the DRA, the parties' arbitration

22    agreement.  That section specifically says:  If you opt out

23    during these 30 days, then you don't have to arbitrate any

24    disputes, and you are not bound by this agreement at all.  In

25    fact, you only have to arbitrate disputes if you go for all

1    30 days and then fail to opt out.  And there are many, many

2    employees, and they don't dispute this, that have opted out and

3    don't have to go to arbitration.  So under the JAMS rules, if

4    it's not required as a condition of employment, the JAMS rules

5    say it's a 50/50 split.

6           THE COURT:  What about the Triple A?

7           MR. NELSON:  The Triple A rules, we're still not sure

8    which rule that they're pointing to for Triple A.  They didn't

9    cite in their motion any --

10          THE COURT:  Do they have that same required --

11          MR. NELSON:  The Triple A rules language is different,

12   your Honor.  I'm not aware whether this is there or not, but --

13          THE COURT:  So you might win one -- that's your

14   view -- and lose another?

15          MR. NELSON:  Potentially, yes, your Honor.  The rules

16   are separate.  They try to put them together, but they are

17   separate rules.  I believe there are 42 petitioners here, your

18   Honor.  Thirty-one of them are JAMS, and they argue that the

19   other eleven are Triple A, so potentially it could come out

20   differently.  But what I would point out for Triple A is that

21   no arbitration agreement incorporates Triple A rules.  So while

22   those 31 do incorporate JAMS rules, the other 11 just say that

23   the parties will decide later who is going to arbitrate, and

24   they don't incorporate any rules at all.

25          Now, the parties here did --

1          THE COURT:  Did this argument get raised before JAMS,

2     and they decided which rule applied?

3          MR. NELSON:  So, your Honor, we raised this argument

4     to JAMS.  They did not address it.  In fact, they said,

5     "Notwithstanding the language in the parties' agreement, we are

6     going to apply our policies."  So they never look at the

7     agreement, and they never resolved our agreement about whether

8     this actually qualifies under this agreement.  They just said,

9     "We're applying our policies.  Our policies are that the

10    employer has to pay," but they never even cited Rule 31(a).

11    They didn't cite their own rule that says the default is 50/50.

12         THE COURT:  But even under your agreement, though, the

13    arbitrator can apportion --

14         MR. NELSON:  Yes, your Honor.

15         THE COURT:  -- appropriately.  And "apportion" doesn't

16    mean 50/50.  It means allocate fairly, or at least that's one

17    fair reading of it.  So you would be able to be content with

18    the arbitrator just deciding what's fair, the individual?

19         MR. NELSON:  Yes, your Honor.  If the arbitrator

20    decided because, let's say, the plaintiff couldn't afford more

21    than 20 percent of the fees, if the arbitrator decided to

22    allocate it 80/20 or something like that, we would be happy to

23    comply, and we have complied, as they pointed out, with all

24    arbitrator rulings on this.  The only thing that's in dispute

25    here is whether X has to pay all of the fees without any

1    requirement in the agreement to do so.  And I would just like

2    to point out, this is a Section 4 petition to compel arbitration.

3    Section 4 specifically says:  Arbitration can only be compelled

4    in accordance with the terms of the agreement, and they've

5    never pointed to anything in the terms of the agreement that

6    says X has to pay all fees.  In fact, it's the opposite.  It

7    says --

8            THE COURT:  No, no, but once you sign on to JAMS and

9    Triple A, you've bought into their rules.  What you're saying,

10   which is interesting, is that Triple A doesn't really have

11   rules on point, and JAMS has this default provision.

12           MR. NELSON:  Yes, and I think JAMS rules are directly

13   on point.

14           THE COURT:  So a fair reading of it is, if you name

15   JAMS, you're accepting their rules of engagement.

16           MR. NELSON:  And I agree with that, your Honor.  I

17   agree that you're accepting their rules, which say that it's a

18   pro rata 50/50 split.

19           THE COURT:  Well, it's either way, and then the

20   question is, who gets to interpret?  And so, in general, you

21   defer to the arbitrator.

22           MR. NELSON:  Well, and this gets to my point about how

23   this is a Section 4 petition.  They've never cited a single

24   Section 4 case that deferred to Triple A or JAMS in granting a

25   motion to compel, none.  Their deference cases where courts

1  deferred to Triple A or JAMS was when there was an appeal taken

2  from an arbitration award, like a motion to vacate or something

3  like that.  But under Section 4 of the FAA, you can only grant

4  a motion to compel arbitration if the terms of the agreement or

5  the rules that are incorporated actually say that.  There's no

6  provision for deferring to Triple A or JAMS.

7       THE COURT:  I think one could -- as I understand it,

8  in the agreements, it names JAMS.

9       MR. NELSON:  Yes, your Honor.

10      THE COURT:  Or it names Triple A.  So I completely

11  agree with the cases that say that you have agreed to their

12  terms.  Now the question is, which I think is a fair question,

13  as I read Judge Rakoff's opinion, whether or not if you agree

14  to them but have the right to opt out within 30 days, is that a

15  mandatory employment?

16      Let me shift back on that one to Ms. Liss-Riordan.

17  That was something that grabbed me.  I know Judge Rakoff ruled

18  one way on that, and what he said -- and I haven't read the

19  record closely enough to be able to know this -- is that JAMS

20  never actually explicitly dealt with that argument.

21      MS. LISS-RIORDAN:  I'm sorry.  The argument that --

22      THE COURT:  That this was not a mandatory --

23      MS. LISS-RIORDAN:  Oh, yes.  That was briefed.  We had

24  briefing before JAMS, and they reached their own interpretation

25  of their own rules.  The same thing with Triple A.

1          THE COURT:  Did they give a reason?

2          MS. LISS-RIORDAN:  There is a letter from the vice

3     president of JAMS in here.

4          Just stepping back, the Court should not be deciding

5     any of this.  This is explicitly delegated in the arbitration

6     agreement.  It says that conditions of employment and the

7     procedures of how the arbitration will proceed are delegated to

8     arbitration.  So what Twitter is trying to do here is get the

9     Court to wade into questions.  Whatever the Court would rule is

10    really beside the point.  They agreed to JAMS; they agreed to

11    Triple A.  The JAMS rules and the Triple A rules both say, "If

12    you use JAMS, you're agreeing to our rules."  Triple A rules

13    say the same thing.

14         THE COURT:  I'm with you so far.

15         MS. LISS-RIORDAN:  The same thing with Triple A, "You

16    use our rules."  They have the tire (?), and we've cited

17    multiple cases for you, to interpret and apply their own rules.

18    They're essentially trying to appeal those decisions by both

19    JAMS and the Triple A.  They made all these arguments to JAMS

20    and the Triple A.  Whether or not they were addressed in the

21    rulings, the letters that were issued is really beside the

22    point.  They had their chance to make the arguments.  They did

23    make their arguments.  This is not the proper place to argue

24    this.  They should just be compelled to follow what is decided

25    in JAMS and Triple A.  Both JAMS and Triple A said, "If you're

1    not happy with the decision, you can take it up with the

2    individual arbitrator."  So, fine, they can do that.  But

3    instead they just refused to move forward.

4          THE COURT:  Oh, I see.  So your view would be, all

5    right, the threshold terminations are made, but the individual

6    arbitrator has the right to essentially reverse it or apportion

7    it.

8          MS. LISS-RIORDAN:  Maybe or maybe not.  That itself

9    would be an interpretation of the rules, but that's not for the

10   Court to decide.  That's to happen in arbitration.  And it's

11   just very clever for them to say that Section 4 requires

12   arbitration to be compelled pursuant to the agreement.  The

13   agreement here says that the parties will arbitrate with JAMS.

14   That is what we are asking this Court to compel arbitration

15   pursuant to JAMS and its rules and its own interpretation of

16   its rules.

17          And the same with Triple A.  For Triple A, for the

18   employees that didn't have JAMS in their agreement, there is a

19   letter agreement between me and the lead counsel for Twitter,

20   and we agreed to use Triple A for those cases.  So, again,

21   under the Triple A rules, the Triple A rules apply whenever the

22   parties agree to arbitrate with the Triple A.  They're trying

23   to get you into this argument that, oh, that JAMS didn't proper

24   apply its rules; Triple A didn't properly apply its rules.

25          The argument about the default when arbitration is not

1    a requirement, that's a question of whether JAMS and Triple A

2    properly interpreted their own rules.  That's not something for

3    this Court to decide.

4            Judge Rakoff we believe was correct as well as

5    Judge Tigar, who agreed with Judge Rakoff.  We think they were

6    both correct in determining that JAMS and Triple A --

7            THE COURT:  Those were JAMS cases, though, right?

8            MS. LISS-RIORDAN:  They were JAMS and Triple A.

9            THE COURT:  Was Triple A in it?

10           MS. LISS-RIORDAN:  In Judge Tigar's case, the *Ma* case,

11   yes, it's JAMS and Triple A, yes.

12           So this clever argument they're making about, oh,

13   well, you could have opted out at the very beginning, you know,

14   whatever; it's for JAMS and Triple A to decide.  It's not for

15   the Court to go wading into that.  It's just like an appeal of

16   an arbitration award:  You can't appeal an arbitration award.

17   You can move to vacate if there's fraud or something.

18           THE COURT:  -- the agreement, let's say later on they

19   want to raise it again in front of the individual arbitrator.

20           MS. LISS-RIORDAN:  Sure.

21           THE COURT:  And the individual arbitrator said, "Well,

22   no, this was not a mandatory.  I'm going to apportion it X, Y,

23   Z way," you know, whatever.  It does seem to allow the individual

24   arbitrator to do that.

25           MS. LISS-RIORDAN:  Yes, yes, and, again, Twitter is

1    blocking that from even happening because it won't even let

2    these cases move forward to get arbitrators selected.  And as I

3    mentioned, we have this case in front of Justice Ireland,

4    retired Supreme Court justice of Washington, and she said on a

5    conference call, "Oh, I've dealt with this many times.  Yes,

6    the employer has to pay the whole thing, end of story.  I'll

7    put this into a written order."  And they protested and said,

8    "Well, this case is in court.  You can't rule on this yet."

9    And so JAMS told her not to rule on this because it's pending

10   in court.  So they're just trying to block these cases from

11   moving forward, which is all just gamesmanship.  They've moved

12   to compel arbitration when it suited them.

13         THE COURT:  Have you all been trying to settle any of

14   these cases?  I mean, it's very offensive, but it's taken two

15   years to even get to arbitration.

16         MS. LISS-RIORDAN:  Right.  Well, it's been almost

17   three years since these cases got filed.  We did mediate

18   several weeks ago.  We did not reach an agreement, so --

19         THE COURT:  On any of them?  You're not agreeing to

20   settle any of them?

21         MS. LISS-RIORDAN:  Well, we've gotten rulings from

22   arbitrators, so the awards are coming out, and --

23         THE COURT:  You're doing well.

24         MS. LISS-RIORDAN:  Well, we're still here.

25         THE COURT:  Do you want to try and settle some of

1  these, I mean, because what's greatly unfair, the theory behind

2  arbitration is that it should happen less expensively and more

3  quickly, and it just seems like this is creating a roadblock.

4  Why don't you go to arbitration and then ask the arbitrator to

5  change it, to apportion it?

6          MR. NELSON:  So, your Honor, we would love for that to

7  happen to get to an arbitrator.  We think the agreement clearly

8  says it's a 50/50 split until then.

9          THE COURT:  It doesn't say 50/50.  It says

10  "apportion."  You're talking about the default rule.

11          MR. NELSON:  Our argument is that the rules are

12  incorporated, and so that's part of the agreement, and the

13  default Rule 31(a) is part of the parties' agreement.

14          THE COURT:  And then it's ultimately up to the

15  arbitrator to apportion it.

16          MR. NELSON:  After the parties get there, yes, your

17  Honor, but the question here is --

18          THE COURT:  Well, why don't you let them go forward

19  and fight it after that?

20          MR. NELSON:  We do, your Honor, in multiple cases.  In

21  *Zhang*, for instance, the agreement they cited, the party, the

22  plaintiff, put forward their half of the fees, and it got to

23  the arbitrator.  The arbitrator ruled one way, and we complied

24  with that.

25          THE COURT:  That's expensive for a human being.

1          MR. NELSON:  So, your Honor, they've never argued that

2     they could not do that, and there's actually a method by which

3     they could argue that if they wanted to, like inability to pay.

4     That's under the *Green Tree* case that we cited from the Supreme

5     Court.

6          THE COURT:  Didn't Musk can all these people and

7     promise severance?

8          MR. NELSON:  Yes.

9          THE COURT:  I mean, that's -- and maybe they could

10    afford it once they got the severance, but then you can't be

11    sure you're going to get the severance.

12         MR. NELSON:  Well, one thing I will just point out,

13    your Honor, is that Musk did not promise severance.  They're

14    arguing that old Twitter before Musk took over.

15         THE COURT:  I'm sorry, I'm sorry, Twitter.

16         MR. NELSON:  And I don't think the merits here are

17    relevant to what the arbitration agreement, with the rules that

18    they incorporated, actually say.  And they haven't disputed any

19    of the cases that we cited that said this is not required as a

20    condition of employment; and if it's not, then the split is

21    50/50.  And one thing with the Triple A cases that I forgot to

22    mention --

23         THE COURT:  No.  That's the default, even under your

24    theory.

25         MR. NELSON:  No, it is the split until the arbitrator

1   can decide otherwise.

2          THE COURT:  Right, right.  I want to clarify that.

3          MS. LISS-RIORDAN:  JAMS has something called the

4   "minimum standards."  They've had this for many years.  The

5   minimum standards say that the employer pays arbitration fees,

6   end of story.  There is an exception if the employee can opt

7   out of arbitration, but the actual language of the rule says,

8   if they're initially required to agree to it, then the employer

9   pays.  So JAMS, Triple A, Judge Rakoff, Judge Tigar all looked

10  at that and said that they were initially required to sign an

11  arbitration agreement -- every one of them did -- and then they

12  could opt out.

13         So, again, it was JAMS and Triple A interpreting their

14  own rules saying this is a condition of employment.  It is not

15  for Twitter to argue to this Court to second guess that

16  decision.  This is a delegated issue expressly in the

17  agreement --

18         THE COURT:  So you're saying -- then you're sort of

19  backing down a little bit.  I thought you left it that it was

20  ultimately up to the individual arbitrator.

21         MS. LISS-RIORDAN:  It is up to the arbitrator.  Okay,

22  in our briefing, we've cited multiple cases for you that

23  there's no difference between a JAMS administrator, the vice

24  president of JAMS, and individual arbitrators.  There's no

25  difference between Triple A saying --

1          THE COURT:  No, I am not going that far.

2          MS. LISS-RIORDAN:  Well, the cases say that, but the

3   point is, we're fine with if they want to raise it again with

4   the arbitrators, both JAMS and Triple A said they could do

5   that, and we've been fine with that, and they still won't go

6   forward.

7          THE COURT:  Right, I think that's the better position.

8          MR. NELSON:  Well, and JAMS actually did not say that.

9   What JAMS says is that it will have the final determination.

10  It actually said that what the arbitrator says it might take

11  into account, but then it would make the final determination,

12  which is not what the parties' agreement says.  The parties'

13  agreement says it has to be the arbitrator, and this Court can

14  only issue a Section 4 order compelling arbitration if it finds

15  that the agreement with the terms that are incorporated

16  actually holds one thing.  Again, they've cited no case

17  compelling arbitration deferring to Triple A or JAMS rules,

18  except for the *Frazier* case which we argue is wrong, your

19  Honor.  There's no other case ever --

20          THE COURT:  Are there any cases that go directly your

21  way on these kinds of cases involving --

22          MS. LISS-RIORDAN:  Yes.

23          THE COURT:  -- that one case, the New Jersey case?

24          MS. LISS-RIORDAN:  And our reply --

25          THE COURT:  No, I'm asking him.

1          MR. NELSON:  So the New Jersey case, that's Judge

2     Martin rod /AOE in *Rosa* specifically actually compelled the

3     petitioner, the plaintiff, to pay half of the fees until the

4     arbitrator can resolve the issue because it was not required as

5     a condition of employment, so holding exactly what we are

6     arguing here.

7          THE COURT:  Are all these cases up on appeal?

8          MR. NELSON:  So that one is not on appeal.

9     Judge Rakoff's decision is on appeal to the Second Circuit.

10    That was already argued two months ago, so we would urge your

11    Honor to rely on that decision, to wait to see what the Second

12    Circuit does.

13         THE COURT:  You know, waiting is not -- you know,

14    that's why I started off with "it's so ironic" because waiting

15    is the antithesis of what arbitration is supposed to be about.

16    It's supposed to be fast, cheap, and that's not what's

17    happening here.

18         MR. NELSON:  So the *Dean Witter Reynolds* case from the

19    U.S. Supreme Court actually said that the more important

20    consideration is enforcing the parties' agreement on its own

21    terms, not efficiency for efficiency's sake.  And if they had

22    just paid their initial half of the filing fees, then we would

23    be in front of an arbitrator two years ago in all of these

24    cases.

25         THE COURT:  Well, how much would you say the average

1    fees were?

2            MR. NELSON:  $2,000 in the *Zhang* case, your Honor.

3            THE COURT:  How much are the average fees in the cases

4    you've had?

5            MR. NELSON:  Are you talking total fees, your Honor?

6            THE COURT:  Yes.

7            MR. NELSON:  I think it's tens of thousands of dollars

8    total.  But what we're arguing about here -- I just want to be

9    clear -- is only the fees until the arbitrator can decide this

10   issue.  And in the *Zhang* case, it was $2,000 per side, and that

11   is the only thing in dispute.  And if they paid that, we would

12   go to the arbitrator.  We are not blocking anything.  We

13   repeatedly said we would pay our half of those fees until we

14   get to the arbitrator.  It's the other side that has said, "We

15   are not going to pay you anything."

16           MS. LISS-RIORDAN:  Your Honor, I would refer you to

17   Pages 6 and 7 of our reply brief, and it's full of cases that

18   recognize that JAMS and Triple A have the authority to

19   interpret their own rules.  The Ninth Circuit, *Jones v. Star*

20   *Enterprises*, 129 F. 4th 1176, we have long case cites.  Jones

21   takes issue with the fact that the compelling order came from

22   the JAMS National Arbitration Committee, which she

23   characterizes as JAMS administrators rather than appointed

24   arbitrator.  "It strains credulity to believe that it is the

25   business of a Federal Court to second-guess an independent

1    arbitration provider's application of its own rules."

2          And we have footnotes with many cases that say the

3    same thing:  This is something to be decided in JAMS.  And they

4    can take it to the individual arbitrators, and if the

5    individual arbitrators say something and JAMS says, "No, you're

6    going to follow our rules," JAMS gets to decide.  But it is not

7    appropriate for Twitter to be arguing before a Federal Court

8    what it said should go to arbitration, these issues that it

9    delegated to arbitrators to determine how these arbitrations

10   would move forward.

11          THE COURT:  Okay, I think I've got the gist of this.

12          MS. LISS-RIORDAN:  And the *Rosa* case is not for

13   publication, the case they hang their hat on.  It was a

14   different procedural posture anyway.  That was just a case

15   where an employee brought a case in court, and Twitter moved to

16   compel arbitration, and then as a "by the way," the court said,

17   "Oh, because you opted out, I think you have to pay fees."  But

18   that wasn't appropriate for the court to decide.  That's

19   something for the arbitrator to decide.

20          THE COURT:  Well, the one thing you won't be getting

21   is a super fast decision because it's quite clear everything

22   here is being appealed, so I need to write it up.

23          MS. LISS-RIORDAN:  Actually, there is no right to

24   appeal an order compelling arbitration.  We've been in that

25   position for years ourselves because we're usually on the other

1    side of that.  This should be done quickly.  We've cited

2    Supreme Court precedent --

3            THE COURT:  Are those ones going up on appeal in the

4    Second Circuit and the what, Ninth?

5            MS. LISS-RIORDAN:  Right.  Well, in our case, in the

6    *Ma v. Twitter* case, Judge Tigar ultimately denied our petition

7    to file arbitration on the ground that we'd have to go to other

8    circuits to file these cases.

9            THE COURT:  I see.

10           MS. LISS-RIORDAN:  So we can appeal an order denying

11   the motion to compel arbitration.  The party that is compelled

12   to arbitration has no right of appeal.

13           MR. NELSON:  Your Honor, that's not correct.  We just

14   argued our appeal in the Second Circuit two months ago in the

15   *Frazier* case, which was exactly the same posture as this case,

16   so that's not correct.

17           THE COURT:  Did they raise that issue, the Second

18   Circuit?

19           MR. NELSON:  I'm not aware of that because I'm not

20   aware of this rule that's being referred to.

21           THE COURT:  What's the rule that says you can't

22   appeal?

23           MS. LISS-RIORDAN:  The rule under the FAA is that you

24   can't appeal an order compelling arbitration.  We've been

25   dealing with this for two decades, that when we get compelled

1    to arbitration, we don't have a right of appeal.

2            THE COURT:  Really?

3            MS. LISS-RIORDAN:  And there is this decision in --

4            (Discussion off the record between plaintiff counsel.)

5            THE COURT:  I think I was appealed once.

6            MS. LISS-RIORDAN:  Right.  Well, we didn't get up

7    appeal, and then you argue about whether there is appellate

8    jurisdiction.  I mean, basically these are just ways parties

9    slow things down when, again, arbitration is supposed to be

10   quick.  That's the whole point.

11           MR. NELSON:  And I'd like to just respond to one point

12   that was made about Pages 6 and 7 of their reply brief.  I urge

13   your Honor to look at those cases.  I'm sure you already

14   have --

15           THE COURT:  No, I haven't, not in the reply brief.

16   I'm on trial.  Let's start with basics.  I've been on trial for

17   a few weeks and will be for another week, so I am not getting

18   to this right away.  And, in addition, I have maybe a million

19   immigration cases.  So I'm not getting to it right away.  Let

20   me start with that.  But what is just absolutely flooring me is

21   that there's such a resistance to the arbitration here.  So it

22   is slowing this down to a halt and making it economically

23   difficult for employees.  I wouldn't mind a situation where we

24   all just agreed to leave it up to the arbitrator, but it's not

25   where that's going.

1          MR. NELSON:  Your Honor, just to finish that thought,

2    if I may, the cases that they cite at Pages 6 and 7, none of

3    them granted a Section 4 petition to compel arbitration, none.

4    They can't find a single case doing that outside of *Frazier,*

5    which is on appeal and was argued two months ago.  All of those

6    cases were appeals or motions to vacate, and that's what

7    they're accusing us of doing.  But I'd just like to point out

8    the simple fact:  We didn't bring this motion.  This isn't our

9    motion.  We're not the ones coming to court.  They brought a

10   motion in court, and they have to prove their burden.  They're

11   trying to shift the burden and say (? Truther) says this,

12   Twitter was appealing and moving to vacate.  But that's not

13   what we're doing.  They're moving to compel arbitration, and

14   under Section 4, they have to show where in the agreement or

15   the rules themselves, not what somebody else says about them

16   but in the rules of the agreement itself that forces Twitter to

17   pay all these fees.

18         THE COURT:  All right.  Well, thank you very much.

19         MS. LISS-RIORDAN:  All you need is an enforceable

20   arbitration agreement, and "the Court shall grant arbitration."

21   They're trying to get into the weeds about what happens once

22   you get there, and that's inappropriate.

23         THE COURT:  I hear your argument.  Okay, thank you.

24         MS. LISS-RIORDAN:  Thank you, your Honor.

25         THE COURT:  We stand in recess.

D R A F T

1          THE CLERK:  All rise.

2          (Adjourned, 3:16 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25